Phillip MILLER, et al., Plaintiffs–Appellants,

v.

Walter DAVIS, III, et al., Defendants–Appellees.

No. 15–3923

United States Court of Appeals, Sixth Circuit.

FILED June 24, 2016

Jessica L. Olsheski, Olsheski Law, Columbus, OH, for Plaintiffs–Appellants.

Maribeth Meluch, Mark D. Landes, Andrew N. Yosowitz, Isaac Wiles Burkholder & Teetor, Columbus, OH, for Defendants–Appellees.

BEFORE: SILER, COOK, and DONALD, Circuit Judges.

SILER, Circuit Judge.

Phillip and Cathy Miller, a married couple, were investigated, prosecuted, tried, and acquitted for allegedly stealing nearly $100,000.00 from Bettie Robbins, Cathy's elderly mother. Upon their acquittal, the Millers brought suit in federal court for intentional infliction of emotional distress ("IIED") and malicious prosecution against Detective Kevin Ullom of the Delaware County Sheriff's Office and Delaware County Prosecuting Attorney Carol O'Brien. In addition, the Millers alleged supervisory liability and invasion of privacy claims against O'Brien. The district court granted summary judgment to the Defendants on all claims. We **AFFIRM.**

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

For nearly two decades, Bettie and her husband, Lester, lived next door to the Millers in a duplex home. When Lester died in 2004, Bettie moved into the Millers' portion of the home. The Millers contend that Bettie, then age seventy-nine, remained in excellent health and fully cared for herself at that time. In 2007, Bettie was diagnosed with Alzheimer's disease and assigned power of attorney over her affairs to Cathy. She began to show signs of dementia in 2008 and ultimately moved into an assisted living facility in 2009.

In December 2009, Larry Robbins—Bettie's son and Cathy's brother—became suspicious that the Millers were financially exploiting Bettie. Larry learned that Bettie's home had been sold to Phillip's mother and that Bettie's bank accounts were significantly depleted. At Larry's urging, Bettie revoked Cathy's power of attorney, assigning it instead to Larry, his other

sister, Vikki Lutz, and her husband, Steve Lutz.

As a result of these concerns, Larry filed a theft report with the Delaware County Sheriff's Office; Detective Ullom was assigned to investigate. Ullom summarized his findings in an investigative report (the "Report"), which characterized Bettie's condition and the families' relationships as follows.

> Bettie L. Robbins is an adult female who has been diagnosed with dementia and probable Alzheimer's. Bettie is unable to provide care for herself. During the dates of these offenses Bettie was 79 YOA to 85 YOA. Bettie previously lived with her husband, Lester Robbins, at 575 South Section Line Rd[.], which was a home the coupled owned. Lester passed away June 9, 2004. . . .

> Bettie and Lester have three adult children, Cathy Miller, Larry Robbins, and Vikki Lutz. In 2004 Cathy Miller resided at 577 South Section Line Rd[.], Delaware, Ohio 43015 with her husband, Phillip Miller. This address is attached to 575 South Section Line Rd[.] and was also owned by Lester and Bettie.

> After Lester's passing Cathy Miller took over as Bettie's primary caregiver. During this time Larry Robbins resided out of State and Vikki Lutz, along with her husband Steve Lutz, lived some distance away from Delaware, Ohio.

Detective Ullom's review of Bettie's financial records yielded $94,637.91 in charges believed to be "fraudulent or unrelated to Bettie Robbins' care." (*Id.*) The flagged charges include the following.

- Within five months of Lester Robbins' death, the balance in the Robbins' previously joint checking account with JP Morgan Chase was depleted from $13,019.13 to less than $1,000.00. Numerous checks from this account, totaling $6,605.13, were written to the Millers and deposited in their bank accounts. Additionally, cash withdrawals from the account between August 2004 and November 2006 totaled $6,060.50. Ullom identified "[s]everal questionable card purchases" totaling $7,841.72 during the same period, including large purchases from Circuit City, Budget Car Sales, an event ticket seller, Home Depot, and Old Navy and Maurice's clothing stores. Moreover, the card was used to make payments on National City and Capital One credit cards that were apparently not used by or for Bettie.

- Bettie's PNC Bank checking account was partially funded by a deposit of $24,466.42 associated with the sale of her home. Ullom noted that within a month of that deposit, the majority of it had been removed from the account.

- Numerous checks were written from the PNC Bank account to the Millers and to cash between December 2004 and March 2005, totaling $19,584.67. Cash withdrawals were also made from the account. Ullom noted "[s]everal questionable card purchases" were made from this account between November 2004 and February 2005. These included payments to an insurance company for an account belonging to the Millers and on a Capital One card, large purchases at Home Depot, and purchases of flowers and airline tickets. Though Bettie apparently never owned or used a cell phone, the card was also used to pay for a cellular account in her name.

- A second JP Morgan Chase bank account in Bettie's name also reflected numerous checks written to the Millers and to cash, totaling $6,592.00, with additional cash withdrawals totaling nearly $4,000.00. Card purchases from this account included large pur-

chases at restaurants, including Domino's Pizza and Buffalo Wild Wings; various clothing stores; a tractor supply store; and a technology company. Although Larry Robbins stated that his mother did not drive and never used a computer, the card was used to purchase gasoline and at an online store for computer parts.

- Records associated with Bettie's PNC Diamond Edition credit card reflected additional purchases at restaurants, gas stations, and clothing stores. The card was also used at a computer game/software retailer and to pay charges to Cathy's Paypal account.

- Records associated with a life insurance policy that belonged to Bettie reflected that the policy was transferred to Cathy in August 2008. The following year, Cathy took a loan against the policy for the maximum allowable amount of $1,200.00 and then surrendered the policy for its remaining value.

- Records indicated that Bettie gave her vehicle, valued at $1,000.00, to Phillip's sister, Jackie Brinkley. In January 2005, Bettie's home was sold to Thelma Miller, Phillip's mother. From that sale, a note was created for an additional loan of $23,500.00 owed to Bettie. Ullom noted that no efforts were made to collect on the note.

Though the Millers disputed that the charges at issue were fraudulent or unrelated to Bettie's care, they did not contest the accuracy of the transactions.

Upon completing his investigation, Ullom submitted his report to the Delaware County Prosecutor's Office. Assistant prosecuting attorney Mark Sleeper was assigned to the case. Having concluded that prosecution was appropriate, Sleeper presented the matter to a grand jury, which returned indictments against the Millers for theft. However, the record in the instant case contains no information regarding the grand jury proceedings. Though the Millers attempted to obtain the grand jury transcript, the Common Pleas Court of Delaware County, Ohio, denied their request.

The Millers were arrested at their home and spent six days in the Delaware County Jail before being released pending trial. During this pretrial period, the Delaware County Prosecutor's Office issued a press release (the "Release") in recognition of World Elder Abuse Awareness Day. Designed to "bring[ ] awareness to the community about crimes committed against the older population in Delaware County," the Release published the Millers' mugshots and described their pending charges.

> The Delaware County Prosecutor's office has handled a multitude of crimes against the elderly. Most recently, a Delaware County Grand Jury indicted a husband and wife for stealing almost $95,000 over a period of seven years from their 86–year–old mother who was in their care.

> Cathy Miller, 48, and her husband Phillip Miller, 51, . . . were each indicted on May 27 on two counts of theft for taking large amounts of money from Cathy Miller's mother. Cathy's mother was diagnosed with dementia and probable Alzheimer's and was unable to care for herself. The Millers had power of attorney, but it was revoked in April 2010 after family members became suspicious of the victim's financial activity. Delaware County Sheriff's office detectives received the case when family members discovered numerous transactions from the victim's bank accounts that were not relevant to her care.

> . . .

> On June 2, both Cathy and Phillip Miller were arraigned and released on their

own recognizance. A trial date for the two is scheduled for Sept. 6, 2011. The Millers both face up to eight years in prison for each second-degree felony.

After being approved by Delaware County Prosecuting Attorney Carol O'Brien, the statement was posted to the office's website and released to local news outlets.

In 2012, the Millers' case proceeded to a bench trial before Judge Patrick M. McGrath of the Common Pleas Court of Delaware County, Ohio. Judge McGrath acquitted the Millers. He observed, "The State relied primarily on records, but the issues here presented involved many, many transactions and over many years.... [T]hey needed to be looked at individually, and they needed to be looked at generally both. The records do not tell the whole story...." Judge McGrath pointed to the testimony of Bettie's attorney, who spoke about her mental acumen; the court also noted that Bettie's doctor found her competent to make financial and health-related decisions until December 2008. These witnesses, Judge McGrath said, "bring an element of reasonable doubt into this case." However, he noted that the prosecution was "[f]ully justified in bringing the case."

Following the acquittal, Cathy contacted Traci Whittaker, Chief Information Officer of the Delaware County Prosecutor's Office, to request that the Release be removed from the office's website. Nonetheless, over a year later, Cathy found that the Release remained on the website. She then wrote a letter to O'Brien requesting that the Release be removed. She now asserts that even after her request, the Release continued to be available online.

In 2013, the Millers sued Ullom and O'Brien, along with numerous other defendants, in federal court under 42 U.S.C. § 1983 and state law. They alleged that Ullom's Report contained "numerous inac-curacies and glaring omissions," that the investigation was incompetent, and that "[t]here was a complete and utter lack of probable cause" for their investigation. After the court granted in part the Defendants' motions to dismiss, the remaining federal claims included (1) Fourth Amendment malicious prosecution claims against Ullom and Walter L. Davis, III, and (2) supervisory liability claims against Davis and O'Brien. Three state law claims remained: (1) malicious prosecution against Davis and Ullom, (2) invasion of privacy against O'Brien, and (3) IIED against Davis, Ullom, and O'Brien.

The district court denied the Millers' request to obtain the grand jury transcript, deeming it untimely in light of the expired deadline for discovery. The Millers have neither briefed nor appealed that order. Therefore, the appellate record is silent as to the contents of the grand jury testimony. In their response to the Defendants' motion for summary judgment, the Millers abandoned their claims against Davis. The district court granted summary judgment for Ullom and O'Brien as to all remaining claims.

## STANDARD OF REVIEW

We review a district court's award of summary judgment de novo. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 894–95 (6th Cir. 2004) (citing *Terry Barr Sales Agency, Inc. v. All–Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996)).

## DISCUSSION

**I. The trial court appropriately granted summary judgment in favor of Ullom as to the federal and state malicious prosecution claims.**

We recognize a claim of malicious prosecution under the Fourth Amendment,

"which 'encompasses wrongful investigation, prosecution, conviction, and incarceration.'" *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006)). This tort is designed to "remed[y] detention accompanied ... by *wrongful institution* of legal process." *Id.* (quoting *Wallace v. Kato*, 549 U.S. 384, 390, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007)). To prevail on a malicious prosecution claim grounded upon the Fourth Amendment, a plaintiff must prove four elements: (1) that the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute"; (2) that the criminal prosecution lacked probable cause; (3) that "as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty ... apart from the initial seizure"; and (4) that the criminal proceeding was resolved in the plaintiff's favor. *Id.* at 308–09 (internal quotation marks and citations omitted).

The Millers contend that Ullom "knowingly gave the grand jurors incorrect information at the grand jury hearing, resulting in a significantly flawed proceeding." Specifically, they assert that Ullom falsely testified that the Millers refused to be interviewed or to otherwise cooperate with the investigation. They further assert that Ullom knowingly offered inaccurate information to the grand jury regarding "the ownership of a life insurance policy, the gift of one of Mrs. Robbins' vehicles to another relative," and several other issues.

**a. Because the Millers' prosecution was supported by probable cause, their malicious prosecution claim cannot withstand summary judgment.**

**i. The grand jury indictment conclusively establishes probable cause.**

■ The Millers' claim turns on the second prong of the *Sykes* analysis: if their arrest and prosecution were supported by probable cause, their claim necessarily fails. *See Bielefeld v. Haines*, 192 Fed. Appx. 516, 520 (6th Cir. 2006) ("The existence of probable cause for an arrest and prosecution defeats a Section 1983 claim under the Fourth Amendment.") (citing *Braley v. City of Pontiac*, 906 F.2d 220 (6th Cir. 1990)). "[I]t has been long settled that the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Barnes*, 449 F.3d at 716 (quoting *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002) (internal quotation marks omitted)). So long as "[t]here is no evidence of perjured testimony or irregularity in the grand jury proceeding," an indictment gives rise to a conclusive presumption that there was probable cause to support an arrest. *See Bakos v. City of Olmsted Falls*, 73 Fed. Appx. 152, 157 (6th Cir. 2003).

An exception to the *Barnes* principle applies "where the indictment was obtained wrongfully by defendant police officers who knowingly presented false testimony to the grand jury." *Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014) (quoting *Mott v. Mayer*, 524 Fed.Appx. 179, 187 (6th Cir. 2013)). The exception extends to "officers who testify with a reckless disregard for the truth." *Id.* (citing *Sykes*, 625 F.3d at 305).

Therefore, the question before us is whether the indictment against the Millers was "fair upon its face." Our inquiry is necessarily a limited one, however; as explained above, the Millers have provided no evidence regarding the grand jury proceedings. Without any evidence of who testified before the grand jury, what evidence was presented, or what testimony was con-

sidered, they cannot overcome the indictment's conclusive proof of probable cause.

The same result inures under Ohio law, which defines the tort of malicious prosecution in a substantially similar fashion. *See Harris v. United States*, 422 F.3d 322, 327 (6th Cir. 2005) ("To prove a malicious-criminal-prosecution claim under Ohio law, a plaintiff must demonstrate (1) that the government officials instituted or continued criminal proceedings with malice, (2) that they lacked probable cause and (3) that the proceedings were then terminated in favor of the accused." (citing *Trussell v. Gen. Motors Corp.*, 53 Ohio St.3d 142, 559 N.E.2d 732, 736 (1990))). One essential difference distinguishes the state tort from the federal one: under Ohio law, an indictment is not preclusive evidence of probable cause but rather prima facie evidence thereof. *See id.* Therefore, Ohio law leaves room for a plaintiff to bring forward "substantial evidence to rebut [the indictment's evidence of probable cause]—for example, by showing that the return of the indictment resulted from perjured testimony or that the grand jury proceedings were otherwise significantly irregular." *Id.* (internal quotation marks and citations omitted).

Here, the Millers have produced no evidence to establish that the return of the indictment resulted from perjured testimony or irregularities in the grand jury proceedings. Therefore, the district court did not err by awarding summary judgment in Ullom's favor.

## ii. Because the Millers' prosecution was supported by probable cause, Ullom enjoys qualified immunity.

■ As stated, Bettie's son reported to the local sheriff's office that the Millers were stealing from his mother. Ullom's investigation reflected depleted account balances, the sale of her house and car to Phillip's relatives, and the transfer of mo-

nies from her bank accounts into the Millers' own.

"[A]n arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (citing *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)). Accordingly, even if a factual dispute exists as to the objective reasonableness of Ullom's actions, he is entitled to qualified immunity if, viewing the facts favorably to the Millers, Ullom could have reasonably believed that the arrest was lawful. Because Ullom's belief cannot be said to have been unreasonable, he enjoys immunity as to this claim.

## iii. The Millers have presented no evidence that Ullom made, influenced, or participated in the decision to prosecute the Millers or that he knowingly presented false statements.

■ Sixth Circuit law dictates that a claim for malicious prosecution against a police officer cannot survive without evidence that the officer caused the plaintiff to be prosecuted. *See Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002) (holding that where "[t]here is no evidence that [the officer] made or even was consulted with regard to the decision to prosecute [the plaintiff]," the officer cannot be held liable for malicious prosecution). Here, no evidence suggests that Ullom made, influenced, or participated in Sleeper's decision to prosecute the Millers.

The Millers insist that Ullom's report—indisputably fundamental to the commencement of the criminal proceedings against them—reflects a defective investigation. They contend that Ullom knowing-

ly provided false information to Sleeper, who in turn misled the jury, resulting in their improper indictment and arrest. True, an officer may be held liable "for making materially false statements either knowingly or in reckless disregard for the truth to establish probable cause for an arrest." *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006) (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)). But the Millers have presented no evidence that Ullom provided false information to Sleeper, that Ullom knew that such information was false, or that the information was material.

The Millers emphatically point to certain information that became known after the Millers' indictment, much of which was raised in testimony during their criminal trial. They contend that Ullom neglected to interview numerous individuals who would have testified that Bettie was competent in 2004. Similarly, they argue that Ullom failed to provide the context for the financial transactions discussed in his Report. The Millers note that Ullom never interviewed Phillip, Cathy, or Bettie herself. And although the Millers acknowledge Larry Robbins' suspicions, they submit that Larry's criminal history and distance from the family's situation should have given Ullom pause in trusting his account.

Whatever the merits of the Millers' criticism of Ullom's investigation, such oversights do not render it constitutionally deficient. "[P]robable cause exists when the police have reasonably trustworthy information [that is] sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense based on the facts and circumstances within [the police's] knowledge at the moment in question." *Peet v. City of Detroit*, 502 F.3d 557, 563–64 (6th Cir. 2007) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)) (alterations in

original) (internal quotation marks omitted). Despite the Millers' insistence that Ullom failed to collect certain exculpatory evidence that would have eliminated probable cause, "once probable cause is established ... the police have no constitutional duty to investigate further or to seek potentially exculpatory evidence." *Martin v. Maurer*, 581 Fed.Appx. 509, 512 (6th Cir. 2014) (citing *Ahlers v. Schebil*, 188 F.3d 365, 371–72 (6th Cir. 1999)). Particularly in light of Larry's report, there can be little doubt that Ullom's investigation yielded ample probable cause.

The Millers argue that Ullom knowingly provided Sleeper with false information by including two alleged untruths in his Report. They first dispute Ullom's observation that Cathy "took over as Bettie's primary caregiver" after the death of Bettie's husband. The parties agree that Bettie moved in with Cathy when she was seventy-nine years old and that Cathy ultimately became Bettie's primary caregiver at some point in the years that followed. However, the Millers contend that Bettie moved in with the Millers simply as a roommate and remained "a fully-functioning adult in charge of her financial affairs until late 2008." The Millers insist that Ullom should have interviewed Bettie or other witnesses rather than "bas[ing] his assumptions purely on the rantings of her estranged son who admitted he was out to get his sister." They assert that "Detective Ullom *knew* that he had no factual basis for making the statement" that Cathy was Bettie's caregiver prior to 2008 and that his statement was therefore "knowingly false."

But the Millers offer nothing beyond these bald assertions. No evidence suggests that Ullom knew that Cathy did not assume responsibility for Bettie's care when Bettie moved into Cathy's home. And more importantly, Cathy's status as a

"primary caregiver" was not material to the probable cause determination; though information about her relationship to Bettie may have provided context for the investigation, it was not an element of the crime. Accordingly, this alleged falsehood is not actionable. *See Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The Millers' objections as to this issue cannot form the basis for a constitutional violation.

The Millers also contest Ullom's characterization of their communications with him. According to Ullom, "Investigators attempted to speak with Phillip and Cathy Miller regarding these matters. Both declined to be interviewed about this case." On appeal, they maintain that contrary to Ullom's portrayal, they were willing to cooperate with the investigation by either speaking to Ullom on the telephone or by arranging an interview through their counsel. Moreover, they note that Ullom spoke only to Phillip and never requested that Cathy provide an interview.

The district court concluded that "the truth or falsity of [Ullom's] statement depends on the way in which one interprets Ullom's contact with Phillip Miller." The court noted that even if the Millers had been willing to speak to Ullom on the phone or conduct an interview through their attorney or if Cathy Miller had been willing to be interviewed without the Millers' attorney, "the discrepancies between those facts and Ullom's statement are minor." Accordingly, the district court determined that any incongruities between Ullom's report and the Millers' intent were immaterial to the grand jury's finding of probable cause. This conclusion appears to be correct; even if Ullom mischaracterized his conversation with Phillip, the Report cannot be said to have been an outright falsehood. Moreover, the effect of any mischaracterization is far from clear: though

the Millers insist that Ullom's characterization of their alleged unwillingness to cooperate with the investigation "cast[ ] a shroud of guilt around them from day one" and that "the prosecutors factored that information into their decision to indict," no evidence supports this inference.

The Millers next contend that Ullom "states outright in his report[ ] that the Millers fraudulently duped their mother into selling her car." However, review of the Report reveals no such statement. It reads, in relevant part: "Vehicle transfer records show a 1985 Oldsmobile belonging to Bettie Robbins was given as a gift to Jackie Brinkley. Larry Robbins reported [that] Jackie is Phillip Miller's sister. Investigators were unable to make contact with Jackie at the time of this report." Though it noted the sale within the context of Bettie's rapidly depleting assets, the Report did not accuse the Millers of theft. As Defendants note, any such inference was made by the prosecutor's office, not by Ullom himself. The same reasoning applies to the Millers' argument regarding the sale of Bettie's home to Phillip's mother: the prosecutor's office, not Ullom, reviewed the facts and concluded that the Millers had committed a crime.

Finally, the Millers take umbrage at Ullom's depiction of a life insurance policy. The Report stated, "This insurance policy previously existed belonging to Bettie Robbins. August 18, 2008, the ownership was transferred to Cathy Miller." Though the Millers insist that Bettie signed the transfer, this argument does not render Ullom's Report false; he never stated that Cathy committed fraud, but simply noted the fact of the transaction.

The district court rejected each of the Millers' arguments regarding Ullom's statements to Sleeper. Because the Millers submitted no evidence to withstand the motion for summary judgment, the district

court did not err in granting summary judgment in Ullom's favor on the malicious prosecution claim.

## II. The Millers' supervisory liability claim against O'Brien fails as a matter of law.

■ The Millers next alleged a claim of supervisory liability against O'Brien, arguing that she was aware that the grand jury considered false information in issuing its indictment. The district court properly granted summary judgment in O'Brien's favor. It noted O'Brien's "minimal participation in the prosecution" and observed that even if her actions were sufficient to invoke supervisory liability, the Millers failed to explain "how or when O'Brien discovered that any of [the] information provided to the prosecution was false."

As an initial matter, "a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006). Because the Millers' Fourth Amendment malicious prosecution claim cannot withstand the Defendants' motion for summary judgment, that obviates the supervisory liability claim for that allegation.

Moreover, as the district court recognized, the Millers were required to demonstrate that O'Brien herself "encouraged the specific incident of misconduct or in some other way directly participated in it." *Phillips v. Roane Cty.*, 534 F.3d 531, 543 (6th Cir. 2008) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). It is not enough to simply point to the doctrine of respondeat superior. *See Shehee*, 199 F.3d at 300 ("This court has held that § 1983 liability must be based on more than respondeat superior, or the right to control employees."). Rather, the Millers must indicate that O'Brien violated the Constitution through her own conduct—that she

"at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Phillips*, 534 F.3d at 543 (quoting *Shehee*, 199 F.3d at 300).

The Millers have failed to make the requisite showing. There is no evidence that O'Brien decided to seek an indictment against the Millers nor that she was aware of their investigation at all until after the indictment had been returned. The Millers maintain that O'Brien testified that she had "some conversations" with Sleeper "about whether or not it was a questionable case." But in the context of the deposition dialogue, the opposite conclusion appears to be more reasonable:

Q. And given that open door policy, was there ever any time when Mr. Sleeper came to you through the open door and said, let's talk about this case, I want to get your input, I want to get your opinion—

A. No.

Q. —on it?

A. No.

Q. And I just want to be clear on this point. You don't remember any conversations, or there were no conversations?

A. I don't remember any conversations about this case. I know there were some conversations about whether or not it was a questionable case.

Q. You don't remember any conversations about this case and you don't remember any conversations about whether it was questionable?

A. No. I know there were no conversations about—

Q. You know there weren't?

A. Right.

Q. Okay.

Moreover, as the Defendants note, any conversations that O'Brien may have had with Sleeper regarding the Millers' indictment were entitled to absolute immunity. *See Imbler v. Pachtman,* 424 U.S. 409, 430–31, 430 n.33, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (explaining that a prosecutor is entitled to absolute immunity when she acts "as advocate for the State" and engages in activity that is "intimately associated with the judicial phase of the criminal process"); *see also Prince v. Hicks,* 198 F.3d 607, 611 (6th Cir. 1999). The Millers also allege that O'Brien met with Larry Robbins and Steve and Vikki Lutz, though precisely how this meeting led to a violation of the Millers' constitutional rights remains unclear. However, to the extent that this meeting contributed to O'Brien's evaluation of the case, she enjoys the same absolute immunity as to this meeting.

Finally, the Millers maintain that O'Brien "was apparently involved" in the prosecutors' decision not to interview the Millers when they offered to waive their *Miranda* rights. O'Brien testified that though she was aware of the Millers' offer, she was not involved in the decision to decline it. Whatever O'Brien's involvement in the meeting, though, she enjoys immunity for it to the extent that it involved trial strategy.

### III. The district court properly awarded summary judgment to O'Brien as to the invasion of privacy claim.

The Millers assert two theories of recovery of the tort of invasion of privacy: (1) the tort of publicity given to one's private life and (2) false light invasion of privacy.

#### a. Publicity given to private life

■ The Millers first assert that by allowing the Release to be posted on her office's website, O'Brien committed the tort of publicity to private life. Ohio law recognizes a claim for invasion of privacy by publication of private facts. *See Housh v. Peth,* 165 Ohio St. 35, 133 N.E.2d 340 (1956). To establish such a claim, a plaintiff must demonstrate that (1) there is publicity; (2) the facts disclosed concern an individual's private life; (3) the matter publicized was one that would be "highly offensive and objectionable to a reasonable person of ordinary sensibilities"; (4) the publication was made intentionally, rather than negligently; and (5) the matter publicized was of no legitimate concern to the public. *Killilea v. Sears, Roebuck & Co.,* 27 Ohio App.3d 163, 499 N.E.2d 1291, 1294–95 (1985) (internal citation omitted).

The Restatement's commentary acknowledges that the tort does not extend to "[i]nvoluntary public figures"—that is, those individuals who "through their own conduct or otherwise have become a legitimate subject of public interest." Restatement (Second) of Torts, § 652D cmt. f.

> Those who commit crime or are accused of it may not only not seek publicity but may make every possible effort to avoid it, but they are nevertheless persons of public interest, concerning whom the public is entitled to be informed. .... These persons are regarded as properly subject to the public interest, and publishers are permitted to satisfy the curiosity of the public as to its heroes, leaders, villains and victims, and those who are closely associated with them.

*Id.* The Restatement further clarifies that "within the scope of legitimate public concern are matters of the kind customarily regarded as 'news.' ... Authorized publicity includes publications concerning homicide and other crimes, arrests, police raids ... and many other similar matters of genuine, even if more or less deplorable, popular appeal." *Id.* at § 652D cmt. g.

According to the Millers, "[T]he facts disclosed are those concerning the Millers' finances and private relationship with their mother." (Appellant Br. at 23.) But the publicized information was undoubtedly of public concern: though the Millers' financial information and familial relationships may have once been private matters, they became public upon issuance of the indictment against them. "The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions . . . are without question events of legitimate concern to the public. . . ." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). Therefore, the district court did not err in concluding that the Release did not satisfy the second and fifth elements of the *Killilea* test.

On appeal, the Millers maintain that even if legitimate public interest existed prior to their trial, any such concern evaporated after their acquittal. (Appellant Br. at 24.) The district court rejected this argument, finding instead that the indictment and its surrounding facts "did not become 'private' issues the moment the public lost interest in them." We agree. *See G.B. v. Rogers*, No. 1:08–cv–437, 2009 WL 1322451, at *11 (S.D. Ohio May 11, 2009) ("There is no privacy right in public records, including court records and the fact of an individual's conviction.").

■ Moreover, even if the reposting of the Report constituted a new cause of action, the Millers have identified no evidence that O'Brien was responsible for the new post. Ohio law affords public employees statutory immunity unless their acts exceeded the scope of their employment or were made "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code Ann. § 2744.03(A)(6)(b). No evidence suggests that O'Brien was aware of the Release's reposting. For

these reasons, the district court's award of summary judgment in O'Brien's favor was not in error.

### b. False light invasion of privacy

■ The Millers next allege that O'Brien committed the tort of false light invasion of privacy, first by allowing the Release to be published and later by allowing the Release to be republished after the Millers' acquittal.

Having adopted the Restatement of Torts (Second), Ohio law provides that

> one who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Welling v. Weinfeld*, 113 Ohio St.3d 464, 866 N.E.2d 1051, 1059 (Ohio 2007). Comment b to section 652E notes that defamation is not necessary for a plaintiff to succeed on a false light theory. Rather, "[i]t is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position." Restatement (Second) of Torts, § 152E cmt. b.

Though O'Brien initially moved to dismiss this claim on the basis that the Release contained no false statements, the district court rejected that argument at the pleadings stage. "If the grand jury indictment were obtained by false testimony and Defendants knew of that fact, publicizing the indictment without reference to

the false testimony could arguably place Plaintiffs in a 'false light.' " *See Penwell v. Taft Broad. Co.*, 13 Ohio App.3d 382, 469 N.E.2d 1025 (1984). As discussed above, however, no evidence suggests that the indictment was obtained with false evidence—and even if this were the case, there is no evidence that O'Brien was aware of that fact.

Importantly, truth is a defense to an action for false-light invasion of privacy. *See Alahverdian v. Grebinski*, No. 3:13–CV–00132, 2014 WL 2048190, at *14 (S.D. Ohio May 19, 2014) ("The truth of a statement serves as a defense against claims of false light. As set forth by Ohio law, in order to make a showing of false light, first, the statement made must be untrue." (internal quotation marks and citation omitted)). In the Millers' view, the Release was replete with false statements. They contend that the Release's statement that they were indicted "for stealing almost $95,000" was false; they insist that they were indicted only for *allegedly* stealing that amount of money. But as the district court noted, this argument disregards the meaning of the word "indicted." Moreover, the Release was clear that the Millers had not been tried.

The Millers also argue that the Release mischaracterized their relationship with Bettie. The Release provided that the Millers were indicted for stealing a sum of money "from their 86–year–old mother who was in their care." They again insist that Bettie was merely their "roommate" and that she did not require their care until several years into her cohabitation with them. They also contest the Release's statement that Bettie "was diagnosed with dementia and probable Alzheimer's and was unable to care for herself."

The district court rejected the Millers' arguments, finding that "to the extent that these statements cast a false light on the Millers' caregiving responsibilities in the years between Lester's death and Bettie's dementia/Alzheimer's diagnosis, that falsity itself would not be highly offensive to a reasonable person." What is more, there is no evidence that O'Brien acted in "reckless disregard" as to the falsity of this matter. *See Welling*, 866 N.E.2d at 1054. Ullom testified that Larry Robbins told him that the Millers had been caring for Bettie, who he said suffered from dementia and Alzheimer's. Robbins also stated that his mother required help managing her finances and certain other matters following her husband's death. Even if this information were ultimately inaccurate, it cannot be said that there was no basis for the statement that the Millers were caring for Bettie.

Moreover, the district court acknowledged the Millers' contention that the Release "indicates falsely to the public that the Millers are criminals who abuse the elderly." But as the district court observed, this argument is grounded in the Millers' insistence that they were innocent of the criminal charges against them. And though they were ultimately acquitted, the Release accurately reported the indictment against them. As the Defendants note, "The Millers[ ] cannot claim to have been portrayed in a false light simply because they had defenses to the charges in the indictment. By that rationale, every defendant who is acquitted following indictment would have an action for false light."

█ Finally, the Millers argue that even if the Release did not initially place them in a false light, it did so when republished in the years following their acquittal. However, they provided no evidence that O'Brien knew that the Release was republished on her office's website or that she controlled its republication. The Millers provided no evidence that O'Brien drafted the Release, had knowledge of any of the

inaccuracies claimed by the Millers, or otherwise acted with malicious purpose, in bad faith, wantonly, or recklessly. Accordingly, the district court did not err.

## IV. Intentional infliction of emotional distress

The district court reasoned that the Millers' claim for IIED against Ullom was based solely upon their argument that Ullom maliciously prosecuted them by lying to the grand jury, and that the IIED claim against O'Brien was premised upon the invasion of privacy claims against her. Having found no evidence to support either of these primary claims, the district court granted Ullom and O'Brien's motion for summary judgment as to the derivative IIED claim.

The Ohio Supreme Court has established the elements of an IIED claim: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (1983) (citation omitted), abrogated on other grounds by *Welling*, 866 N.E.2d at 1054–59. "[E]xtreme and outrageous conduct" gives rise to liability when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting Restatement (Second) of Torts

§ 46 cmt. d.). "Whether conduct is 'extreme and outrageous' is initially a question of law for the court." *Morrow v. Reminger & Reminger Co., L.P.A.*, 183 Ohio App.3d 40, 915 N.E.2d 696, 714 (2009) (citation omitted).

■ As discussed above, the Millers presented no evidence that Ullom lied to or misled the prosecutor's office in an effort to cause them emotional distress. Instead, as the Defendants note, two different judges have each found that the Millers' prosecution was justified. And even if Ullom can be said to have misjudged the evidence, this mistake does not constitute the "extreme and outrageous conduct" contemplated by the tort of IIED.

The same is true of O'Brien's press releases, which the district court stated did not "shock the conscience" for purposes of a constitutional claim. The Millers have not appealed that ruling, and they provide no evidence that O'Brien's press releases were so "outrageous in character" as to constitute IIED. Accordingly, the district court did not err by granting Ullom and O'Brien summary judgment on the Millers' IIED claims.

**AFFIRMED.**